# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, on behalf of itself and all other similarly situated holders of Class B common stock of HUBBELL INCORPORATED, | |
| Plaintiff, | Civil Action No._____ |
| v. | |
| CARLOS M. CARDOSO, ANTHONY J. GUZZI, NEAL J. KEATING, JOHN F. MALLOY, DAVID G. NORD, CARLOS A. RODRIGUEZ, JOHN G. RUSSELL, STEVEN R. SHAWLEY, RICHARD J. SWIFT and BESSEMER TRUST COMPANY, N.A., AS TRUSTEE FOR THE HARVEY HUBBELL TRUST and THE LOUIS E. ROCHE TRUST, and HUBBELL INCORPORATED, | DEMAND FOR JURY TRIAL |
| Defendants. | OCTOBER 16, 2015 |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Norfolk County Retirement System ("Plaintiff"), on behalf of itself and all other similarly situated holders of Class B common stock ("Class B Stock") of Hubbell Incorporated ("Hubbell" or the "Company"), brings the following Verified Class Action Complaint (the "Complaint") against the Company for (i) breach of contract and (ii) breach of the implied covenant of good faith and fair dealing, against the current members of the board of directors of Hubbell (the "Hubbell Board" or "Board") for (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing, (iii) inequitable coercion, and (iv) breach of fiduciary duty, and against Bessemer Trust Company, N.A. (the "Trustee"), as Trustee of the Harvey Hubbell Trust and the Louie E. Roche Trust (collectively, the "Trusts") for aiding and abetting the Company's and Board's breach of contract and the Board's breaches of fiduciary duty.  The

allegations of the Complaint are based on the knowledge of Plaintiff as to itself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## NATURE OF THE ACTION

1.      Hubbell is a publicly traded Connecticut corporation with two classes of common stock: (a) Class A common stock (the "Class A Stock"), which entitles holders to 20 votes on each matter put to a stockholder vote; and (b) Class B Stock, which entitles stockholders to one vote on each matter put to a stockholder vote.  The holders of the Class A Stock ("Class A Stockholders") control 74% of Hubbell's total voting power.

2.      For more than a decade, Hubbell's certificate of incorporation (the "Charter")[1] has contained a provision that expressly prohibits disparate economic treatment between the Class A Stock and Class B Stock, including in connection with the payment of cash dividends or otherwise (the "Charter Prohibition").[2]  Under Connecticut law, a corporation's certificate of incorporation is a contract among the corporation and the corporation's shareholders.  Thus, in purchasing their shares of Hubbell common stock, the holders of Class B Stock ("Class B Stockholders") contracted for the protection afforded by the Charter Prohibition—specifically, that Class A Stockholders would *not* receive more favorable economic treatment than the Class B Stockholders in connection with any corporate transaction.

3.      Plaintiff brings this action because the Hubbell Board is attempting to coerce Class B Stockholders into permitting a clear violation of the Company's Charter by proposing (a)

_____

[1] A copy of the Charter is attached hereto as Exhibit A.

[2] The only exception is one limited circumstance not applicable to transaction at issue in this action.

a purportedly beneficial reclassification of the Company's stock and (b) the potential repurchase by the Company of $250 million in common stock, but conditioning the reclassification and stock repurchases on Class B Stockholders acquiescing to the payment of a significant cash dividend to Class A Stockholders.

4.     On August 23, 2015, the Hubbell Board approved a plan to reclassify the Company's common stock to eliminate the existing dual-class structure (the "Reclassification"). Under the Reclassification, (a) each share of Class A Stock and Class B Stock will be reclassified into one share of common stock having one vote per share on all matters brought to a stockholder vote (the "Common Stock") *and* (b) each holder of Class A Stock will also receive $28 in cash (the "Cash Dividend") for each share of Class A stock held (or about $200 million in total cash consideration).  That is, every share of each class of Hubbell stock will be converted into a share of Common Stock, but Class A Stockholders will receive an additional $28 in cash for each of their Class A shares while Class B Stockholders will receive *no cash*.

5.     To circumvent the Charter Prohibition, the Company's Board has conditioned the Reclassification on an amendment to the Charter (the "Charter Amendment"), which will require approval from holders of both Class A Stock and Class B Stock, with each class voting as a separate group and voting together.  The Board has similarly conditioned up to $250 million in stock repurchases (the "Stock Repurchases") on stockholders approving the Charter Amendment.

6.     The Board has stated that eliminating the Company's dual-class structure will be beneficial to Hubbell's stockholders, including by increasing the liquidity of the Company's shares.  Hubbell stockholders also understand the presumptive benefits of the Stock Repurchases, including increased earnings per share and the resulting potential increase in the price of their shares of common stock.

7.     However, the Board has told Class B Stockholders that in order to receive the purported benefits of the Reclassification and the Stock Repurchases, Class B Stockholders must also vote to eliminate the Charter Prohibition and thus agree to give Class A Stockholders hundreds of millions of dollars in cash to which they would not otherwise be entitled.

8.     By "bundling" the proposed Charter Amendment with the Reclassification and the wholly unrelated potential Stock Repurchases, the Board is wrongfully coercing Class B Stockholders into eliminating the Charter Prohibition and permitting the payment of the Cash Dividend.

9.     The coercive nature of the vote is compounded by the fact that the Hubbell Board, in breach of its fiduciary duties, (a) has failed to disclose to stockholders all material information necessary to cast an informed vote on the Reclassification and associated Charter Amendment and (b) in fact appears to be misleading stockholders concerning the purported benefits of the Reclassification.

10.     *First*, the preliminary Form S-4 registration statement (the "S-4") filed in connection with the proposed Reclassification makes no mention of the Charter Prohibition or the fact that the Cash Dividend presently is prohibited under Hubbell's existing Charter.  Thus, stockholders risk unwittingly relinquishing valuable contract rights.

11.     *Second*, the Board has touted certain purported benefits that Class B Stockholders will potentially receive if they approve the Reclassification, but those benefits appear to flow primarily to Class A stockholders, who hold an illiquid security.  Indeed, the S-4 suggests that Class B Stockholders will experience the potential for improved liquidity, *i.e.,* Class B Stockholders will be able to more freely and easily sell their shares on the open market.  Yet, prior to the Company's announcement of the proposed Reclassification, shares of Class B Stock

traded freely on the open market, with an average daily trading volume in the hundreds of thousands of shares.   Thus, it appears that any purported liquidity benefit to Class B Stockholders is entirely illusory.

12.     By contrast, shares held by Class A Stockholders appear to be largely illiquid, with an average daily trading volume of only approximately 1,500 shares over the past year, and at least 17 trading days where no shares of Class A Stock were purchased or sold.  Thus, it appears that any purported benefits of liquidity would inure almost entirely to Class A Stockholders and not Class B Stockholders.  Despite receiving this significant benefit, Class A Stockholders will also receive ***hundreds of millions of dollars*** if the Reclassification and Charter Amendment are approved, while Class B Stockholders will receive no cash.

13.     Notably, as explained in more detail below, nearly half of the shares of Class A Stock are held by Trusts (defined below), the beneficiaries of which are descendants of the founder of Hubbell who, for the past several years, have been seeking to cause the Trusts to liquidate their Hubbell stock holdings.  The terms of the Reclassification were reached with the input and substantial assistance of the Trustee.

14.     The Board has also represented to stockholders that voting in favor of the Reclassification will remove the Trusts' supposed "negative control" of the Company and ability to block future beneficial transactions for stockholders, such as a sale of the Company.  But there is no indication that the Trusts – whose beneficiaries are seeking to have the Trusts sell their shares – would seek to block a beneficial transaction, such as an acquisition of the Company.

15.     *Third*, and relatedly, the S-4 fails to disclose the extent of the benefits that Class A Stockholders will receive if the Reclassification and Charter Amendment are approved by stockholders. As indicated above, Class A Stockholders will receive valuable liquidity if

stockholders approve the Reclassification.  Additionally, prior to the Company's announcement of the proposed Reclassification and Cash Dividend, Class A Stock was trading at a *discount* to shares of Class B Stock, *i.e.*, at a *lower* price per share.  Yet, through the approximately $200 million Cash Dividend, Class A Stockholders are receiving a significant *premium* to not only (a) the price of shares of Class B Stock, but also (b) the trading price of Class A Stock prior to the announcement of the Reclassification. Furthermore, the S-4 does not disclose whether the Board's financial advisors assessed the fairness of the proposed premium to shares of Class A Stock relative to the trading price of Class A shares prior to the proposed Reclassification.

16.     *Fourth*, the S-4 does not disclose why the Board has conditioned the Stock Repurchases on stockholders approving the Reclassification and Charter Amendment.  It is nonsensical that stockholders would have to authorize the Board to pay the approximately $200 million Cash Dividend in order for the Board to be willing to expend *additional* hundreds of millions of dollars repurchasing shares of the Company's stock.

17.     *Fifth*, the Board has also failed to disclose whether it or its financial advisors considered or evaluated alternatives to the Cash Dividend or why, after decades of having a dual class stock structure, the Board suddenly determined to undertake the Reclassification.  The S-4 also fails to disclose how or whether the Board and its financial advisors determined the Reclassification was fair to Class B Stockholders relative to the benefits that will be received by Class A Stockholders.

18.     *Sixth*, the S-4 fails to disclose material information concerning the Board's process in considering and negotiating the proposed transactions, including (a) the composition of the Board subcommittee that approved the proposed transactions, (b) information concerning the Board and subcommittee's financial advisor, (c) whether the Board or its subcommittee

deliberated concerning the Charter Prohibition, and (d) whether the Board or subcommittee utilized the Charter Prohibition as a lever in negotiations with the Trusts.

19.     Plaintiff seeks to enjoin the stockholder vote on the Reclassification unless and until the Board remedies and eliminates (a) the disparate economic treatment of the Company's Class A and Class B stockholders in connection with the Reclassification, (b) the wrongfully coercive aspects of the stockholder vote, and (c) the disclosure deficiencies identified herein.

## THE PARTIES

20.     Plaintiff owns shares of Class B Stock of Hubbell and has owned shares of Class B Stock of Hubbell at all material times alleged herein.  Plaintiff does not own Hubbell Class A common stock.  Plaintiff is a citizen of the Commonwealth of Massachusetts.

21.     Defendant Hubbell is primarily engaged in the design, manufacture and sale of quality electrical and electronic products for a broad range of non-residential and residential construction, industrial and utility applications.  The Company is a Connecticut corporation, with its principal offices located at 40 Waterview Drive, Shelton, Connecticut.   Accordingly, defendant Hubbell is a citizen of the State of Connecticut.  The Company's Class A Stock and Class B Stock trade on the New York Stock Exchange ("NYSE") under the ticker symbols, "HUB.A" and "HUB.B," respectively.

22.     Defendant Carlos M. Cardoso ("Cardoso") has served as a member of the Hubbell Board since 2013.  Defendant Cardoso is a citizen of the Commonwealth of Pennsylvania.

23.     Defendant Anthony J. Guzzi ("Guzzi") has served as a member of the Hubbell Board since 2006.  Defendant Guzzi is a citizen of the State of Connecticut.

24.     Defendant Neal J. Keating ("Keating") has served as a member of the Hubbell Board since 2010.  Defendant Keating is a citizen of the State of Connecticut.

25.     Defendant John F. Malloy ("Malloy") has served as a member of the Hubbell Board since 2011.  Defendant Malloy is a citizen of the Commonwealth of Pennsylvania.

26.     Defendant David G. Nord has served as Chairman of the Board, President and Chief Executive Officer ("CEO") of the Company since May 2014, and President and CEO since January 2013.  Previously, he served as the Company's President and Chief Operating Officer from June 2012 to January 2013, and Senior Vice President and Chief Financial Officer from September 2005 to June 2012.  Defendant Nord is a citizen of the State of Connecticut.

27.     Defendant Carlos A. Rodriguez ("Rodriguez") has served as a member of the Hubbell Board since 2009.  Upon information and belief, defendant Rodriguez is a citizen of the State of New Jersey.

28.     Defendant John G. Russell ("Russell") has served as a member of the Hubbell Board since 2011.  Defendant Russell is a citizen of the State of Michigan.

29.     Defendant Steven R. Shawley ("Shawley") has served as a member of the Hubbell Board since 2014.  Defendant Shawley is a citizen of the Commonwealth of Virginia.

30.     Defendant Richard J. Swift ("Swift") has served as a member of the Hubbell Board since 2003.  Defendant Swift is a citizen of the State of New Jersey.

31.     Defendant Trustee has served as the Trustee of the Trusts since June 2014.  The Trustee holds approximately 3.5 million shares of Class A Stock collectively for the benefit of the Trusts, representing 49% of the voting power of the Class A Stock and 36% of the Company's total voting power.  The Trustee is a national association headquartered at 630 Fifth Avenue, New York, New York.  Accordingly, the Trustee is a citizen of the State of New York.

32.     Defendants Cardoso, Guzzi, Keating, Malloy, Nord, Rodriguez, Russell, Shawley and Swift are collectively referred to herein as the "Individual Defendants." The Individual Defendants and the Trustee are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

34.     Venue is proper in this District pursuant to because defendant Hubbell is headquartered in this District; because the Individual Defendants are directors and/or officers of a corporation headquartered in this District; because defendants Guzzi, Keating and Nord are residents of this District; and because a substantial portion of the acts in furtherance of the wrongdoing and its effects have occurred or will occur in this District.

## SUBSTANTIVE ALLEGATIONS

**I.      Background On Defendant Hubbell**

35.     In 1888, Harvey Hubbell II founded Hubbell as a proprietorship.

36.     Hubbell was incorporated in Connecticut in 1905.

37.     In 1957, Harvey Hubbell III, who had succeeded his late father as President of the Company, and his mother, Louie E. Roche, formed the Harvey Hubbell Trust and the Louie E. Roche Trust, respectively. The beneficiaries of the Harvey Hubbell Trust were Harvey Hubbell III and his wife, children and grandchildren. The beneficiaries of the Louie E. Roche Trust were Louie E. Roche and her son (Harvey Hubbell III), grandchildren and great-grandchildren.

38.     Today, Hubbell is primarily engaged in the design, manufacture and sale of quality electrical and electronic products for a broad range of non-residential and residential construction, industrial and utility applications.

39.     Hubbell has a dual-class capital structure.  Each share of Hubbell Class A Stock is entitled to 20 votes on each matter put to a stockholder vote and each share of Hubbell Class B Stock is entitled to one vote.

40.     The shares of Class A Stock represent 12% of the Company's total equity but control 74% of Hubbell's total voting power.

## II.     The Trusts Seek Liquidity And Diversification

41.     In recent years, the beneficiaries of the Trusts have been seeking to cause the Trusts to liquidate some or all of their Hubbell stock holdings.  For example, in 2008, certain beneficiaries of the Trusts sued the then-trustees of the Trusts for thwarting an offer from Mason Capital Management, LLC to purchase all of the Hubbell Class A Stock from the Trusts at a substantial premium over the then-trading price.  *See Hubbell v. Ratcliffe*, 2009 Conn. Super. LEXIS 2065 (Conn. Super. Ct. July 28, 2009).

42.     In June 2014, Bessemer became the Trustee of the Trusts, pursuant to the settlement of certain litigation between the former trustees of the Trusts and one of the beneficiaries of the Trusts.   In the months following Bessemer's appointment as Trustee, Bessemer met with Hubbell's management on several occasions to discuss the Company's operating results, business strategy and certain other undisclosed matters.

43.     On October 7, 2014, *Reuters* published an article entitled "Exclusive:  Hubbell trustee reviews options for controlling stake," which publicly revealed that Bessemer had hired Credit Suisse Securities LLC ("Credit Suisse") to review transactional options for the Class A

Stock.  The *Reuters* article led John Seward at *Benzinga* to report that "Hubbell Incorporated's Controlling Family Reportedly Wants Out."

### III.    The Hubbell Board Agrees To The Reclassification To The Benefit Of The Class A Stockholders, Including The Trusts

44.    On October 9, 2014, Hubbell engaged Morgan Stanley & Co. LLC ("Morgan Stanley") to serve as the Company's financial advisor in connection with the Board's review of the Company's equity capital structure, including a potential reclassification of the Class A Stock and the Class B Stock into a single class of common stock.[3]

45.    Over the course of the remainder of the fall of 2014 and into the spring of 2015, the Board reviewed certain potential options with respect to Hubbell's equity capital structure and the Trusts' interest in the Company.  The Board was assisted in this review by an ad hoc subcommittee (the "Ad Hoc Committee") whose composition the Board and Company has not disclosed.

46.    On April 8, 2015, the Trustee requested a meeting with Hubbell's senior management team.  On May 4, 2015, Credit Suisse, the financial advisor to the Trustee, called Morgan Stanley and requested that the Company be prepared to discuss at the meeting possible options for the Trusts' shares.

47.    At the May 14, 2015 meeting among the Company, the Trustee and their respective advisors, the Trustee expressed its interest in diversifying the Trusts' holdings, maximizing value for the Trusts and, to the extent consistent with the foregoing objectives,

---

[3] The Company agreed to pay Morgan Stanley (i) a $1.5 million fee upon delivery of Morgan Stanley's fairness opinion in connection with the Reclassification, (ii) an additional $5.0 million fee upon consummation of the Reclassification, and (iii) a discretionary fee of up to $2.0 million. The Company has also agreed to reimburse Morgan Stanley for the bank's reasonable and documented expenses incurred in connection with the engagement.

maintaining an ongoing economic interest in the Company.  The Trustee and Hubbell management determined that it was advisable for the parties to further evaluate the possibility of a transaction that would result in the reclassification of the Class A Stock and the Class B Stock into a single class of common stock.

48.    On June 11, 2015, Hubbell proposed to the Trustee a possible reclassification transaction pursuant to which the holders of Class A Stock would have the option to elect to receive (a) $53.64 in cash and 0.643 shares of Class B Stock, (b) cash of an equivalent value, or (c) stock of an equivalent value.  As of June 11, 2015, each of the three consideration options was valued at approximately $125.00 per share of Class A Stock, which constituted an approximately 12.6% premium to the then-trading price of the Class B Stock.

49.    On July 15, 2015, Credit Suisse, on behalf of the Trustee, delivered a counterproposal to Morgan Stanley.  Pursuant to this counterproposal, the Company would reclassify its two classes of common stock into a single class of common stock with the holders of Class A Stock receiving additional cash in respect of their high-voting rights.  Credit Suisse proposed a cash premium of 35% to the then-trading value of the Class B Stock, representing a package value of approximately $145.02 per share of Class A Stock based on the then-current price of the Class B Stock.

50.    On July 29, 2015, Morgan Stanley contacted Credit Suisse to convey the Company's counterproposal.  Hubbell proposed a reclassification of the two classes of common stock into one class, with each share having one vote per share, and the holders of Class A Stock receiving, in respect of their high-voting rights, a cash amount equal to a 26% cash premium to the price of the Class B Stock at announcement of the proposed reclassification, representing a

package value of approximately $132.73 per share of Class A Stock based on the then-current trading price for the Class B Stock.

51.     On August 5, 2015, Credit Suisse conveyed the Trustee's revised proposal, which provided that the cash premium to be paid to holders of the Class A would be an amount equal to 32% of the then-current trading price of the Class B Stock on the NYSE.  The Trustee's revised proposal represented a package value of approximately $138.63 per share of Class A Stock.

52.     Around August 7, 2015, Morgan Stanley contacted Credit Suisse to propose a potential reclassification in which each holder of Class A Stock would receive $28.00 per share in cash together with one share of common stock for each share of Class A Stock held, representing a package value per share of Class A Stock of $131.90 per share based on then-current trading prices, or a premium of approximately 26.9%.

53.     Shortly thereafter, Credit Suisse presented another counterproposal to Morgan Stanley, in which each holder of Class A Stock would receive $28.50 per share in cash, together with one share of common stock for each share of Class A Stock held, representing a package value of $132.40 per share of Class A Stock based on the then-current trading prices, or an approximately 27.4% premium.  The Trustee also sought reimbursement of up to $4 million of the Trustee's financial and legal expenses incurred in connection with the proposed reclassification.

54.     On August 20, 2015, the Company and the Trustee discussed a compromise whereby the Company would pursue a reclassification of each share of Class A Stock and Class B Stock into one new class of common stock, with each holder of Class A Stock being entitled to receive $28.00 in cash in respect of each share of Class A Stock and the Trustee entitled to expense reimbursement in the amount of up to $4 million.

55.     On August 23, 2015, the Hubbell Board approved the Reclassification on the terms detailed in the preceding paragraph.

56.     Thus, the Trusts will receive approximately $98 million in the Reclassification, after which they can cash out some or all of their Hubbell shares.  The Trustee has agreed to vote all of the Trusts' shares of Class A Stock in favor of the Reclassification (the "Voting Agreement").

57.     The Reclassification also benefits defendants Cardoso, Guzzi, Keating, Malloy, Rodriguez, Russell, Shawley and Swift, each of whom holds Class A Stock under the Company's Deferred Compensation Plan for Directors.  Specifically, these directors have received portions of their annual Board and committee retainers in stock units.  Each stock unit consists of one share each of Class A Stock and Class B Stock.  Accordingly, each of defendants Cardoso, Guzzi, Keating, Malloy, Rodriguez, Russell, Shawley and Swift has a personal pecuniary interest in the Reclassification.

## IV.     The Board Announces The Proposed Reclassification In Conjunction With The Potential Stock Repurchases

58.     On August 24, 2015, the Company issued a press release publicly announcing the proposed Reclassification.

59.     The Company also announced that on August 23, 2015 the Hubbell Board had also authorized the repurchase of $250 million of shares of Hubbell common stock.

60.     The press release indicated that the Board plans to undertake the Stock Repurchases upon the completion of the Reclassification.

**V.    The Payment Of The Cash Dividend To The Class A Stockholders**
**Violates The Charter**

61.    As indicated above, under the terms of the Reclassification, each holder of

Class A Stock will be entitled to receive $28.00 in cash for each share of Class A Stock held, and

each share of Class A Stock will be reclassified into one share of Common Stock, having one

vote upon all matters brought before a meeting of the Company's shareholders.  The total cash

consideration to be paid to Class A Stockholders in the Reclassification is approximately $200

million.

62.    Also under the terms of the Reclassification, each share of Class B Stock will

simply be reclassified into a share of Common Stock having one vote upon all matters brought

before a meeting of the Company's stockholders.[4]  Class B Stockholders will not be entitled to

the Cash Dividend or any other cash consideration.

63.    This disparate consideration (*i.e.*, cash paid to Class A Stockholders that will not

also be paid to the Class B Stockholders) violates the Company's Charter.  The Charter states:

> [e]xcept as may otherwise be provided by law, the holders of record of Class A
> and Class B Common Stock shall vote as a single class, and the holder of record
> of each issued and outstanding share of Class A Common Stock shall be entitled
> to have 20 votes and the holder of record of each issued and outstanding share of
> Class B Common Stock shall be entitled to have one vote, upon all matters
> brought before any meeting of the stockholders of the corporation. ***In all other***
> ***respects***, ***whether as to dividends*** or upon liquidation, dissolution or winding up
> of the affairs of the corporation, ***or otherwise***, ***the holders of record of the***
> ***Class A Common Stock and the holders of record of the Class B Common Stock***
> ***shall have identical rights and privileges on the basis of the number of shares***
> ***held*** except that stock dividends may be declared and paid on shares of Class A
> Common Stock in whole or in part in shares of Class B Common Stock.

---

[4] Even if the agreement relating to the Reclassification (the "Reclassification Agreement") is
terminated and the Reclassification does not occur, the Company nonetheless may be required to
reimburse the Trustee for certain documented out-of-pocket expenses incurred in connection
with the Reclassification Agreement.

(emphasis added).

64.     Thus, the Charter explicitly prohibits economic preferences with respect to cash dividends or otherwise.  Since the Cash Dividend will be paid only to Class A Stockholders and not Class B Stockholders, the Reclassification violates Hubbell's Charter.

## VI.     The Hubbell Board Attempts To Coerce Class B Stockholders Into Approving The Reclassification

65.     As explained above, the Reclassification, which will be effectuated through the Charter Amendment, is conditioned upon obtaining approval from holders of both Class A Stock and Class B Stock, each voting as a separate group and voting together.  The Hubbell Board, however, is wrongfully coercing the Company's Class B Stockholders into approving the Charter Amendment.

66.     On a "clear day," Hubbell Class B Stockholders would have no rational economic reason to vote to eliminate Charter Prohibition, but the Board has "bundled" the Charter Amendment with the Reclassification, a transaction that the Board has told Class B Stockholders will offer myriad benefits to Hubbell and the Class B Stockholders.

67.     Indeed, the Board has touted a number of purported benefits flowing from the Reclassification, including:

- Better alignment of economic interests and voting rights of all shareholders;

- Elimination of negative control by the Trusts and a reduction in the concentration of voting power;

- Enhancement of the Company's flexibility in structuring and executing strategic transactions; and

- Improved trading volume and liquidity for common stock.

68.     Further, the Board has also combined the Stock Repurchases, which will result in increased earnings per share and a potential increase in the price of shares of the Company's common stock, with the Charter Amendment.

69.     Thus, Hubbell's Class B Stockholders are being coerced into supporting the removal of the Charter Prohibition, which they otherwise would have no rational basis to do.

70.     If Class B Stockholders want the benefits that (a) the Board has told stockholders will result from the Reclassification and (b) will likely result from the Stock Repurchases, then they must agree to forgo the contractual protection provided by Charter Prohibition.   The Board's bundling of the elimination of the Charter Prohibition with the Reclassification and the Stock Repurchases in this manner is inequitable, disloyal and patently coercive.

## VII.   Hubbell Files The Materially Incomplete and Misleading S-4

71.     As indicated above, on September 11, 2015, the Company filed the S-4, which seeks stockholder support for the Charter Amendment to facilitate the Reclassification.

72.     The S-4 fails to disclose all material information necessary to allow Hubbell Class B Stockholders to cast an informed vote on the Reclassification and misleads stockholders concerning various aspects of the proposed transaction.  Among other things, the Proxy contains material omissions or misleading statements concerning:

        a.      The Charter Prohibition;

        b.      The purported benefits of the Reclassification to Class B Stockholders;

        c.      The extent of the benefits that will be realized by Class A Stockholders if the Reclassification is consummated;

        d.      Why the Board has conditioned the wholly unrelated Stock Repurchases on stockholders approving the Reclassification and Charter Amendment;

        e.      Whether the Board considered alternatives to the Cash Dividend;

f.     Whether the Board's financial advisors determined the Reclassification was fair to Class B Stockholders relative to the benefits that will be received by Class A Stockholders (*i.e.*, a relative fairness opinion);

g.     Whether there was any Board discussion of the Charter Prohibition in connection with its deliberations regarding the Reclassification;

h.     Whether the Board attempted to use the Charter Prohibition to negotiate a lower premium to the Class A Stockholders in connection with the Reclassification;

i.     The composition of the Ad Hoc Committee;

j.     Whether there were any communications between Credit Suisse and Morgan Stanley regarding a potential reclassification during the period from October 9, 2014 to April 8, 2015;

k.     Why Morgan Stanley was selected as the Company's financial advisor;

l.     How the $4 million expense reimbursement payable to the Trustee was calculated; and

m.     Whether there have been any discussions between the Board and the Trustee regarding the potential repurchase of the Trust's Common Stock after the Reclassification.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all other holders of Hubbell's Class B common stock (except Defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

74.     This action is properly maintainable as a class action.

75.     The Class is so numerous that joinder of all members is impracticable. The Company has thousands of Class B Stockholders who are scattered throughout the United States. As of July 15, 2015, there were 50,703,910 shares of Hubbell Class B Stock outstanding.

76.     There are questions of law and fact common to the Class that predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a.      Whether the Company and the Individual Defendants are liable for breach of contract in connection with the Reclassification;

b.      Whether the Company and the Individual Defendants are liable for breach of the implied covenant of good faith and fair dealing in connection with the Reclassification;

c.      Whether the Individual Defendants have violated Connecticut General Statute Section 33-757 by, in bad faith, agreeing to pay the Cash Dividend in violation of the Charter;

d.      Whether the Individual Defendants are inequitably coercing Hubbell's Class B Stockholders into voting in favor of the Charter Amendment to eliminate the Charter Prohibition;

e.      Whether the Individual Defendants have breached their fiduciary duties by (i) causing the Company to violate the Charter, (ii) coercing Hubbell's Class B Stockholders into voting in favor of the Charter Amendment to eliminate the Charter Prohibition, and (iii) failing to disclose all material information relating to the Reclassification and Stock Repurchases;

f.      Whether the Trustee is liable for aiding and abetting the Company's and/or Board's breaches;

g.      Whether Plaintiff and the other members of the Class are being and will continue to be injured by the wrongful conduct alleged herein and, if so, what is the proper remedy and/or measure of damages; and

h.      Whether Plaintiff and the other members of the Class are entitled to injunctive and/or other equitable relief.

77.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class.

78.     Plaintiff is committed to prosecuting this action and has retained highly competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

79.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

80.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

## COUNT I

### (Direct Claim For Breach Of Contract Against The Company And The Individual Defendants)

81.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

82.     The Charter is a contract among the Company and the Company's stockholders.

83.     The Charter explicitly prescribes the rights of Class A Stockholders and Class B Stockholders.

84.     The Class B Stockholders contracted for the protections afforded by the Charter in making in purchasing Class B Stock and maintaining their investment.

85.     The Cash Dividend payable only to Class A Stockholders violates the Charter and constitutes a breach of contract.

86.     As a result of the Charter violation, Hubbell's Class B Stockholders will be deprived of their contractual right to equal economic treatment in the event that the Company declares and pays a cash dividend to the holders of Class A Stock.

**COUNT II**

**(Direct Claim For Breach Of The Implied Covenant Of Good Faith And
Fair Dealing Against The Company And The Individual Defendants)**

87.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

88.     As explained above, the Charter is a contract among the Company and the Company's stockholders.

89.     Under Connecticut law, every contract carries an implied duty or covenant requiring that no party to the contract injure or frustrate the right of another party to receive the benefits of the contract or its provisions.

90.     The Company and the Individual Defendants have breached the implied covenant by, in bad faith, acting to impede the Class B stockholders' ability to receive the protections of the Charter Prohibition by, among other things, (a) proposing a purportedly beneficial Reclassification but only permitting Class B Stockholders to receive those purported benefits if they relinquish their rights under the Charter; (b) conditioning the potentially beneficial and wholly unrelated Stock Repurchases on Class B Stockholders' approval of the Charter Amendment; (c) intentionally misleading Class B Stockholders into relinquishing valuable contract rights by failing to disclose to Class B Stockholders that (i) the Charter presently prohibits payment of the Cash Dividend and (ii) the purpose of the Charter Amendment is to eliminate the Charter Prohibition; and (d) misleading Class B Stockholders regarding certain aspects and potential benefits of the Reclassification.

91.     As a direct and proximate consequence of the foregoing, Plaintiff and the Class have been and will be harmed and have no adequate remedy at law.

## COUNT III

## (Direct Claim Under Connecticut General Statute § 33-757 Against The Individual Defendants)

92.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

93.     The Individual Defendants approved the terms of the Reclassification, including the Cash Dividend, as alleged herein.

94.     The Cash Dividend constitutes a distribution in violation of Company's Charter under Connecticut. Gen. Stat. § 33-757.

95.     Accordingly, the Individual Defendants are liable for the amount of the Cash Dividend that is unlawfully distributed.

## COUNT IV

## (Direct Claim For Aiding And Abetting Breach Of Contract Against The Trustee)

96.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

97.     The Company and the Individual Defendants have breached the Company's Charter by approving the Cash Dividend to the Class A Stockholders, as alleged herein.

98.     The Trustee (a) negotiated the terms of the Reclassification, including the Cash Dividend, with the Company and the Individual Defendants and (b) entered the Voting Agreement with the Company to help ensure approval of the Reclassification.  The Trustee therefore was generally aware of its role as part of the Company and the Individual Defendants' breach of the Charter and knowingly and substantially assisted the Company and the Individual Defendants' breach of the Charter.

## COUNT V

### (Direct Claim For Inequitable Coercion Against The Individual Defendants)

99.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

100.     If members of the Class wish to receive the purported benefits of the Reclassification and the Stock Repurchases, they must also approve the Charter Amendment, which will eliminate their contractual protection against the Cash Dividend.

101.     The bundling of the Charter Amendment, the Reclassification, and the Stock Repurchases is inequitably coercive from the perspective of the Class B Stockholders.  If Class B Stockholders do not approve the Cash Dividend, then they will be denied the purported benefits of the Reclassification and Stock Repurchases.  Members of the Class are thus coerced into supporting the Charter Amendment lest they be deprived of the purported benefits of the Reclassification and the Stock Repurchases.

102.     Furthermore, by misleading Class B Stockholders concerning, among other things, the purported benefits of the Reclassification, Class B Stockholders are being wrongfully induced into approving the Charter Amendment.

103.     As a direct and proximate consequence of the foregoing, Plaintiff and the Class have been and will be harmed and have no adequate remedy at law.

## COUNT VI

### (Direct Claim For Breach Of Fiduciary Duty Against The Individual Defendants)

104.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

105.     The Individual Defendants, as Hubbell directors, owe the Class the utmost fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as

directors and/or officers of Hubbell and/or their exercise of control and ownership over the business and corporate affairs of the Company, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.  Each Individual Defendant was required to: (a) use their ability to control and manage Hubbell in a fair, just, and equitable manner; (b) act in furtherance of the best interests of Hubbell and ***all*** of its stockholders (not just their own); and (c) fully disclose all material information relating to the Reclassification and the Cash Dividend so that stockholders can make a fully informed voting decision.

106.    The Individual Defendants have breached their fiduciary duties owed to the Class by causing the Company to violate the Charter, which has deprived the Company's Class B Stockholders of their right to equal economic treatment in connection with the Reclassification.

107.    Moreover, the Individual Defendants have breached their fiduciary duties owed to the Class by structuring the stockholder vote on the Charter Amendment in an unlawfully coercive manner.  This breach of duty strips the Company's Class B Stockholders of their right to cast an un-coerced vote on the Charter Amendment.

108.    Additionally, the Individual Defendants have breached their fiduciary duties by (a) failing to disclose all material information relating to the Reclassification necessary to allow Hubbell stockholders to cast a fully informed vote and (b) misleading Class B Stockholders concerning various aspects of the Reclassification. Thus, Hubbell's Class B Stockholders are being deprived of their right to cast a fully informed vote on the Reclassification.

109.    Plaintiff and the Class have no adequate remedy at law.

## COUNT VII

### (Direct Claim For Aiding And Abetting Breach Of Fiduciary Duty Against The Trustee)

110.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

111.    The Individual Defendants have breached their fiduciary duties owed to the Class in connection with the Reclassification, as alleged herein, including, *inter alia*, by approving the Cash Dividend which violates the Company's Charter, structuring the stockholder vote on the Reclassification so as to attempt to coerce Class B Stockholders into approving the Reclassification; and making false and misleading disclosures regarding the Reclassification.  As a result of such breaches, the Class has been harmed and will continue to be harmed.

112.    The Trustee (a) negotiated the terms of the Reclassification, including the Cash Dividend, with the Individual Defendants, and (b) entered the Voting Agreement to help ensure approval of the Reclassification.  The Trustee therefore was generally aware of its role as part of the Individual Defendants' breaches of fiduciary duties and knowingly and substantially assisted the Individual Defendants' breaches of fiduciary duties.

113.    Plaintiff and the Class have no adequate remedy at law.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

a.    Enjoining Defendants from holding the stockholder vote on the Reclassification unless (a) the Cash Dividend has been declared invalid, and (b) all material information necessary to allow Hubbell stockholders to cast a fully informed ballot on the Reclassification is disclosed;

b.    Finding the Company and the Individual Defendants liable for breach of contract;

c.  Finding the Company and the Individual Defendants liable for breach of the implied covenant of good faith and fair dealing;

d.  Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Class by (i) disregarding the terms of the Charter and depriving the Class B Stockholders of their right to equal economic treatment vis-à-vis the Class A Stockholders, (ii) breaching the implied covenant of good faith and fair dealing; (iii) structuring the vote on the Charter Amendment in a wrongfully coercive manner, and (iv) failing to disclose all material information relating to the Reclassification;

e.  Finding the Individual Defendants liable for the amount of the Cash Dividend under Connecticut Gen. Stat. § 33-757;

f.  Finding the Trustee liable for aiding and abetting the Individual Defendants' breach of contract;

g.  Finding the Trustee liable for aiding and abetting the Individual Defendants' breaches of fiduciary duties;

h.  Revising or rescinding the terms of the Reclassification and/or the Cash Dividend, or requiring that any cash payment or dividend be made equally to Class A stockholders and Class B stockholders;

i.  Certifying the proposed Class and awarding its members compensatory damages, together with pre- and post-judgment interest;

j.  Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants' and experts' fees; and

k.    Granting such other and further relief as this Court may deem to be just, equitable and proper.

**THE PLAINTIFF**

By: _/s/ David A. Slossberg_____
David A. Slossberg [ct13116]
David C. Shufrin [ct29230]
Hurwitz, Sagarin, Slossberg & Knuff, LLC
147 North Broad Street
P.O. Box 112
Milford, CT 06460
Tel: (203) 877-8000/Fax: (203) 878-9800
DSlossberg@hssklaw.com
DShufrin@hssklaw.com

*OF COUNSEL:*

Eric Zagar
Kristen Ross
KESSLER TOPAZ MELTZER CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL PLLC
240 East 79th Street, Suite A
New York, NY  10075
(888) 529-1108

Christine S. Azar
Ned Weinberger
LABATON SUCHAROW LLP
300 Delaware Ave., Suite 1340
Wilmington, DE  19801
(302) 573-2540

**VERIFICATION**

COMMONWEALTH OF MASSACHUSETTS )
                                ) ss:
COUNTY OF NORFOLK               )

Joseph Connolly, being duly sworn, does hereby state as follows:

1.    I am the Treasurer of Norfolk County Retirement System ("Norfolk"), a continuous holder of Hubbell Incorporated Class B common stock during all relevant times alleged in the Verified Class Action Complaint (the "Complaint").

2.    I make this verification on behalf of Norfolk and under penalty of perjury.

3.    I have read the Complaint and have consulted with counsel.

4.    The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief.

Executed this _15_ day of October, 2015.

Joseph Connolly
Treasurer
Norfolk County Retirement System

Sworn to and subscribed before me

this _15 th_ day of October, 2015.

Notary Public

My Commission Expires _April 20, 2018_

2